No. 6106. Tarver *v.* Smith, Secretary of Department of Social and Health Services of Washington. Sup. Ct. Wash. Certiorari denied. Mr. Justice Brennan is of the opinion that certiorari should be granted. [For earlier order herein, see 401 U. S. 906.]

Mr. Justice Douglas, dissenting.

The ability of the Government and private agencies to gather, retain, and catalogue information on anyone for their unfettered use raises problems concerning the privacy and dignity of individuals.[1] Public and private agencies are storing more and more data. "If your name is not in the records of at least one credit bureau, it doesn't mean that you don't rate. What it does mean is that you are either under twenty-one or dead." [2]

A file may show that an individual was arrested. But will it show the arrest was unconstitutional because it was solely for purposes of investigation? Or that the charges were dropped? Or that a jury acquitted him?

Other "facts" may be in a file. Did he vote for Henry Wallace? Was he cited by HUAC? Is he subversive? Did he ever belong to any subversive organizations?

Private files amass similar irrelevancies and subjective information. Is he well regarded in his neighborhood as to character and habits? Does he have domestic difficulties? Is he "slow" in paying his bills?

---

[1] Law reviews have been devoting increasing attention to the problem. Recently two total issues have been devoted to the legal problems. See 15 U. C. L. A. L. Rev. 1374 and 31 Law & Contemp. Prob. 251. See also Symposium: Computers, Data Banks, and Individual Privacy, 53 Minn. L. Rev. 211; Note, Privacy and Efficient Government: Proposals for a National Data Center, 82 Harv. L. Rev. 400; Freed, A Legal Structure for a National Medical Data Center, 49 B. U. L. Rev. 79; Miller, Personal Privacy in the Computer Age, 67 Mich. L. Rev. 1091.

[2] H. Black, Buy Now, Pay Later 37 (1961).

The problems of a computerized society[3] with large data banks are immense. Who should have access to the files on an individual? For what purposes should access be allowed? Should an individual be informed each time information is passed on to new parties? How long should information be retained? What mechanisms ought there be for correcting factual errors?

This case presents the latter issue. A caseworker has prepared a highly critical report on petitioner setting forth in detail factual allegations and accusing petitioner of child neglect. The report recommends that petitioner be permanently deprived of the custody of her children. Custody was temporarily placed in juvenile court because petitioner was hospitalized. Subsequently a hearing in juvenile court was held and petitioner was exonerated and retained custody of her children. But the critical report—which petitioner alleges is false—remains in the files with the Department of Social and Health Services of the State of Washington.

Not surprisingly, petitioner would like the allegedly false information removed from those files. But her efforts to obtain a hearing to correct the information have failed.

The State says that petitioner's file is "confidential and privileged" and under current state law the file may be disclosed only "for purposes directly connected with the administration of public assistance and specific investigatory purposes by legislative committees and properly authorized bodies." Respondent's Brief 6. Just how many people and agencies this includes is unclear. The only thing perfectly clear from this record is that

---

[3] "[T]he computer can also be an agent of oppression, if, for example, its fantastic memory is used to place indelibly on record all the events in a man's life, all his mistakes and weaknesses, precluding all hope of their effacement, every stimulating possibility of a new chance in life." R. Prebisch, Change and Development, Latin America's Great Task 209 (1970).

petitioner has no rights under state law to a hearing to correct the reports even if they are total lies. And it appears petitioner will never be informed prior to transmittal of her file to the various "authorized" groups.

The State contends that petitioner will suffer no harm from having the material in her files. We are told everyone will know the report is only an opinion; the decree of the juvenile court will be included; and the file will be treated confidentially. While, of course, we cannot know if the information is false and cannot tell which and how many uses will be made of the file, it is apparent that petitioner does raise some serious questions concerning its use. Participation "in the new Work-Incentive Programs is initiated by a referral by respondent's department of, among others, persons who are 'appropriate for referral.' R. C. W. 74.22.020; 74.23.040. Those who are referred receive substantial training benefits as well as increased cash benefits. R. C. W. 74.22.050, 060; R. C. W. 74.23.060, 070. Similarly, the availability of sheltered workshop programs depends upon a determination by the respondent's department that the subject, if a 'disadvantaged person,' 'can reasonably be expected to benefit from, or in his best interests reasonably requires' such a program. R. C. W. 28A.10.080 (2)." Petition 7 n. 2. The only answer that respondent gives to this is that any "information transmitted to the Employment Security Department under the Work Incentive Program is for the benefit of the recipient." How petitioner would benefit from the transmission of the allegedly false material we are not told.

The Washington State public assistance programs are designed to receive federal assistance whenever federal funds are available. Various provisions in the appropriate title of the Revised Code of Washington dealing with public assistance refer to conformity with and pri-

macy of federal law. *E. g.,* Wash. Rev. Code § 74.04.055 (Supp. 1970) (if more than one construction possible, favor that "most likely to satisfy federal laws"); Wash. Rev. Code § 74.23.005 (Supp. 1970) ("The legislature hereby expresses its intention to comply with the requirements under the federal social security act, as amended, creating a work incentive program" for mothers receiving Aid to Families with Dependent Children); Wash. Rev. Code § 74.23.900 (Supp. 1970) (if any part of the chapter conflicts with federal law it is to that extent inoperative). The record in this case is not clear as to which types of public assistance petitioner is receiving. Prior to the temporary unsuccessful attempt to remove her children from her custody she was receiving AFDC benefits. From the references in the briefs to eligibility for the AFDC Work Incentive Program it would appear that she is now again receiving AFDC benefits.

When federal funds are used, then standards are to be shaped and tested federally. *Helvering* v. *Davis,* 301 U. S. 619; *Ivanhoe Irrig. Dist.* v. *McCracken,* 357 U. S. 275, 295; *Rosado* v. *Wyman,* 397 U. S. 397, 427 (concurring opinion).

If meanwhile she was denied a fair hearing under state law, an important question of procedural due process is raised under the Fourteenth Amendment. For petitioner's right to continued assistance—an important property interest—cannot be reduced or terminated without notice and an opportunity to be heard. Cf. *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337.

If petitioner was at the time receiving federal assistance then under HEW Regulations, she was entitled to a fair hearing.

The Department's regulations require that provision be made for granting a fair hearing:

> "to any individual requesting a hearing because his claim for financial or medical assistance is de-

nied, or is not acted upon with reasonable prompt-ness, *or because he is aggrieved by any other agency action affecting receipt, suspension, reduction, or termination of such assistance or by agency policy as it affects his situation.*" 45 CFR § 205.10 (a)(3), eff. April 14, 1971 (emphasis added). 36 Fed. Reg. 3034.

As the Solicitor General says in his brief, filed at our request:

"One may say, quite simply, that the report which petitioner challenges threatens receipt of AFDC payments by threatening to deprive petitioner of her children, on which her receipt of AFDC benefits depends. One of the federal requirements for a state plan for AFDC is that it must:

"(16) provide that where the State agency has reason to believe that the home in which a relative and child receiving aid reside is unsuitable for the child because of the neglect, abuse, or exploitation of such child it shall bring such condition to the attention of the appropriate court or law enforcement agencies in the State, providing such data with respect to the situation it may have [42 U. S. C. (Supp. IV) 602 (a)(16)].

"If any question were now to arise as to the suitability of the home for the children, the prior report might well have an effect on referral of the case to the courts and action by the courts, notwithstanding the 1967 decision of the Juvenile Court. Thus, the report retains a constant potential effect on petitioner's custody of her children and thereby on her receipt of assistance."

We cannot be sure of the exact posture of this case;

but whether or not the claim at the time was federally funded, a question of national importance is presented. Accordingly, I would grant the petition for certiorari.